UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

RADIAN GROUP INC. and RADIAN
GUARANTY INC.,

        Plaintiffs,

    v.

RHIANNON BOLEN, ARCH CAPITAL
GROUP LTD., ARCH CAPITAL GROUP
(US) INC., ARCH U.S. MI HOLDINGS
INC., and ARCH U.S. MI SERVICES INC.

        Defendants.

Civil Action No. _____

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Radian Group Inc., and Radian Guaranty Inc. ("Radian," "Plaintiffs" or "Company"), by and through their undersigned counsel, hereby bring the following Complaint against Rhiannon Bolen ("Bolen"), Arch Capital Group Ltd. ("Arch Group"), Arch Capital Group (US) Inc. ("Arch Group US"), Arch U.S. MI Services, Inc. ("Arch MI Services") and Arch U.S. MI Holdings, Inc. ("Arch MI Holdings") (hereinafter collectively referred to as the "Arch Defendants," and, collectively with Bolen, "Defendants") seeking injunctive relief and damages.

### PRELIMINARY STATEMENT

1.      Radian pursues this action to prevent Bolen, a former employee of Radian Guaranty Inc., and the Arch Defendants, an international mortgage insurance group, from misappropriating Radian trade secrets and causing Radian irreparable harm as the Arch Defendants enter the United States mortgage insurance market in direct competition with Radian.

2.      Radian has been a provider of private mortgage insurance and related risk management products and services to mortgage lenders nationwide for more than thirty-five years. Radian has approximately 800 associates, including its sales force, which operates

nationwide.   There are approximately seven companies actively participating in the private mortgage insurance industry in the United States.

3.      During her tenure with Radian, Bolen managed and supported Radian's relationships with key regional mortgage lenders at the corporate level by, among other things, creating streamlined processes to help improve customers' business by utilizing Radian's value added services or programs, developing and coordinating strategic planning initiatives and pricing strategies, and identifying strategic customer opportunities and sell features and benefits that are unique to Radian to enhance partnerships and help to increase market share.   As further described below, her activities and responsibilities touch a significant portion of the Company's existing and potential business.

4.      The Arch Defendants are a global provider of insurance and re-insurance products.   They are entering the United States mortgage insurance marketplace through an acquisition of CMG Mortgage Insurance Company, a mortgage insurance company currently competing in the private mortgage insurance industry, and the mortgage insurance operating platform snd related assets of PMI Mortgage Insurance Co. ("PMI").   Upon information and belief, the Arch Defendants are poised to commence operations in the U.S. mortgage insurance marketplace in November 2013, by offering mortgage guaranty insurance for loans originated by credit unions as well as traditional lenders in direct competition with Radian.

5.      Through her employment with Radian, Bolen was bound to comply with the Company's Code of Conduct and Ethics ("Code of Conduct"), attached hereto as Ex. A, which establishes the standards of professionalism that Radian requires of its employees.   The Code of Conduct sets forth Radian's policies with respect to business conduct, confidentiality, workplace conduct, and information and computer systems use.

6.     In September 2012, in consideration for a grant of restricted stock units, Bolen agreed in writing to not compete against Radian for a one-year period following her separation from the Company.  In that agreement, Bolen acknowledged that she had been and would be exposed to Radian's trade secrets and confidential information in the course of the performance of her job duties.  She also agreed that she was prohibited from disclosing or using this information for any purpose other than for the benefit of Radian.  These reasonable and limited restrictions provided assurances to Radian that its investment in Bolen, and trade secrets and confidential information would only be used for legitimate purposes to benefit the Company and that Bolen and any subsequent employer of Bolen would not benefit from the Company's investment, or its trade secrets and confidential information.

7.     Radian's need for effective injunctive relief is a direct result of Defendants' actions.  On August 27, 2013, Bolen resigned from Radian.  Prior to that time, upon information and belief, the Arch Defendants induced Bolen to leave her employment with Radian and accept employment with an imminent strategic competitor in the United States mortgage insurance industry in direct violation of her existing confidentiality obligations and restrictive covenants agreement with Radian.

8.     At the time of Bolen's resignation, it was unknown to Radian that Bolen had surreptitiously sent valuable and confidential intelligence about several Radian customers, and the future strategic needs of those customers, to a personal email account.

9.     Indeed, some of the confidential information that Bolen sent to her personal email account related to two key Radian customer accounts for which Bolen had no responsibility whatsoever, and which alone accounted for over $1.1 billion in new insurance written in 2012 and nearly $1.5 billion in new insurance written thus far in 2013.

10.     Bolen's transmittal of Radian's confidential information by email to a personal email account violated several sections of Radian's Code of Conduct, including its confidentiality and use of the Company's systems policies.

11.     After advising Radian of her resignation, Bolen refused to identify her new employer when directly asked by Radian.  Specifically, Bolen refused to disclose that she would be working for the Arch Defendants in a competitive position with her former co-workers from PMI – her employer prior to Radian.  Bolen's evasiveness and refusal to identify her new employer, and her misdeeds with Radian's confidential customer intelligence, particularly in light of the confidentiality obligations and restrictive covenants she agreed to with Radian, demonstrate both her intent to flout the terms of those obligations and agreement and her unwillingness to protect Radian's trade secrets and confidential information.  Under these circumstances, Radian is compelled to seek judicial relief in order to protect its rights and to prevent irreparable harm.

12.     Radian's need for effective injunctive relief is particularly necessary in light of the job duties Bolen performed for Radian.  Over the course of her employment at Radian, Bolen was exposed to and had extensive knowledge of Radian's trade secrets and confidential information, including, but not limited to, the means by which Radian identifies potential needs within the mortgage insurance industry and the customers Radian has identified and worked with to develop and foster beneficial relationships.

13.     Bolen worked for Radian for approximately eighteen months as a regional account manager in Radian's Southern Division.  In this role, Bolen was the primary point of contact for seventeen of Radian's most valued customers in the Southern Region.  The customers

for whom Bolen was responsible accounted for more than $1.5 billion in new insurance written in 2012 and were on track for approximately $2 billion in new insurance written in 2013.

14.     As Radian's point of contact, she developed and serviced Radian's client relationships.  She also analyzed Radian's customers' business needs, price concerns, value-added activity and strategic communications and plans for Radian to grow relationships with the customers.  Bolen was actively involved in the internal development of strategic initiatives and pricing strategies for Radian customers.  The knowledge Bolen gleaned from Radian's confidential information and trade secrets during her employment with the Company will give competitors, such as the Arch Defendants, an unfair competitive advantage.

15.     Radian brings this action to prevent Defendants from causing irreparable harm to the Company through the Defendants' attempt to flout the common law, contractual and statutory law obligations of Radian's former employee Bolen, or allowing the Arch Defendants to unfairly benefit from Radian's investment, resources, confidential information and trade secrets.

## JURISDICTION AND VENUE

16.     Jurisdiction is proper over Bolen due to her express consent pursuant to the terms of § 8(f) of a Restricted Stock Unit Grant between Bolen and Radian dated August 14, 2012 (the "Stock Unit Agreement"), attached hereto as Ex. B.

17.     Jurisdiction is further based upon the complete diversity of citizenship between the parties, as Radian is a citizen of Pennsylvania, Bolen is a citizen of Texas, Arch Group is a citizen of Bermuda, and Arch Group US, Arch Services and Arch Holdings are citizens of New Jersey.

18.     Venue is proper in this District Court pursuant to 28 U.S.C. § 1391(a) and the terms of § 8(f) of the Stock Unit Agreement.  See Ex. B.

19.     The District Court has subject matter jurisdiction over all counts pursuant to 28 U.S.C. § 1332 since the amount in controversy in the present action exceeds the sum or value of seventy-five thousand dollars ($75,000.00), exclusive of interests and costs.

## THE PARTIES

20.     Plaintiff Radian Group Inc. is a Delaware corporation with its principal place of business at 1601 Market Street, Philadelphia, Pennsylvania  19103.

21.     Radian Guaranty Inc., a wholly owned subsidiary of Radian Group Inc., is a Pennsylvania corporation with its principal place of business at 1601 Market Street, Philadelphia, Pennsylvania 19103.

22.     Defendant Arch Capital Group Ltd. is a Bermuda public limited liability company with its principal place of business at Wessex House, 5th Floor, 45 Reid Street, Hamilton, HM 12 Bermuda.

23.     Defendant Arch Capital Group (US) Inc. is a Delaware corporation with its principal place of business at 300 Plaza Three Floor 3, Jersey City, NJ 07311.  Arch Capital Group (US) Inc. is a wholly owned subsidiary of Arch Capital Group Ltd.

24.     Defendant Arch U.S. MI Services, Inc. is a Delaware corporation with its principal place of business at 300 Plaza Three Floor 3, Jersey City, NJ 07311.  Arch U.S. MI Services, Inc. is a wholly owned subsidiary of Arch Capital Group Ltd.

25.     Defendant Arch U.S. MI Holdings, Inc. is a Delaware corporation with its principal place of business at 300 Plaza Three Floor 3, Jersey City, NJ 07311.  Arch U.S. MI Holdings, Inc. is a wholly owned subsidiary of Arch Capital Group Ltd.

26.     Defendant Rhiannon Bolen is an individual and a citizen of the State of Texas, residing at 101 Tuesday Haus Lane, Highland Village, Texas  75077.

### FACTUAL ALLEGATIONS

**A.    Radian's Business and Its Reliance on Trade Secrets and Confidential Information to Drive Its Success**

27.     Radian Group Inc. is a credit enhancement company with a primary strategic focus on domestic, first-lien residential mortgage insurance.  Radian Guaranty Inc. is a leading provider of credit-related insurance coverage, principally through private mortgage insurance, and risk management services to mortgage lending institutions.  Through its line of insurance products, Radian helps protect lenders from default-related losses on residential mortgages.  The Company helps clients and investors to manage risks in varied market condition, and its products are available throughout the United States.

28.     The private mortgage industry in the United States consists of approximately seven companies, including Radian.  Radian has been an active part of the industry for 35 years.  It is a leader in the industry.

29.     There are several general categories that constitute Radian's trade secrets and confidential information that are relevant to this action.  For instance, Radian's customer relationships have been developed through significant effort and constitute an independent trade secret.  Through its close and confidential partnerships with customers, Radian and its customer-facing employees, which included Bolen, gain confidential knowledge of customers' needs, preferences, pricing requirements and key contacts.  Through the Company's resources and efforts as well as years of commitment to quality customer service, Radian has generated good will with its customers, which is a valuable protectable interest.  Radian understands its customers' needs (and, frequently just as important, what its customers do not need or want) and

has shared that knowledge with the Company's customer-facing employees to develop specialized customer service for the benefit of both Radian and the customer.

30.     Certain Radian personnel are regularly engaged in strategic planning across various markets to assess Radian's customers' current and future needs and best position the Company to meet those needs throughout the United States. Radian's strategic planning is not known publicly or even within the Company outside of the select employees who participate in Radian's strategic initiatives. During her employment, Bolen was actively engaged in – and developed a comprehensive knowledge of – Radian's strategic planning initiatives, particularly pricing and value-added activity.

31.     In addition, Bolen regularly attended meetings during which Radian's highly confidential pricing information and strategies were discussed in detail and developed. As a result of Bolen's access to Radian's confidential information, she gained a comprehensive understanding of a critical aspect of Radian's strategies for competing in the mortgage insurance marketplace. Bolen was also actively engaged in a small internal committee that enhanced Radian's connectivity with a loan origination system, which improved Radian's sales effectiveness based on the committee's analysis of a variety of competitive information.

32.     Upon information and belief, Radian's customer knowledge and relationships are superior in the industry because of Radian's commitment to developing an extensive depth of services and broad customer base for more than thirty-five years as well as the longevity of its sales force. Radian's superior customer knowledge and relationships provide value both to the Company and to its customers. These relationships and knowledge give Radian a competitive advantage over existing and prospective competitors, such as the Arch Defendants.

33.     This is particularly true of the Company's information when compared to the Arch Defendants, who are acquiring CMG Mortgage Insurance Company, an already licensed and existing mortgage insurance company that presently competes with Radian in the mortgage insurance market space for credit union lenders, but not traditional lenders.   On information and belief, the Arch Defendants will leverage Bolen's knowledge of Radian's confidential information to accelerate its ability to directly compete with Radian for both credit union and traditional lenders.

34.     Radian recognizes the tremendous value of its trade secrets and confidential information and takes steps to protect access to such information.

35.     Radian has comprehensive policies, including the Code of Conduct, that require employees to keep the Company's business information confidential and prohibit employees from using the Company's information for any purpose other than the benefit of Radian.  All new employees are made aware of Radian's Code of Conduct and its confidentiality policies during Radian's new hire orientation process.

36.     Radian employees are required to review, and acknowledge their agreement to be bound by, the terms of the Code of Conduct at the outset of their employment. Thereafter, Radian employees are also required, on an annual basis, to review and reaffirm their agreement to be bound by the Code of Conduct.

37.     On April 13, 2012, Bolen completed her new hire acknowledgment and agreement to be bound by the Code of Conduct.

38.     On July 19, 2013, Bolen completed the annual certification that reaffirmed that she agreed to be bound by the Code of Conduct.

39.     The Code of Conduct requires that Radian employees "act with the utmost integrity, good faith and honesty with regard to the Company and act in the Company's best interests at all times."  An employee's failure "to act with integrity and honesty is a violation of the Code [of Conduct] and, in circumstances where the employee . . . gains a personal benefit from the violation, may constitute fraud."  Ex. A at 5.

40.     The Code of Conduct prohibits employees from engaging in conduct that involves a conflict between the interests of the employee and Radian, specifically, competing with Radian in any of its business activities.  Id. at 7.

41.     The Code of Conduct includes clear restrictions on the use of confidential information relating to Radian, defines what Radian considers to be its confidential information, and emphasizes that compliance with the Code of Conduct is mandatory.  The Code of Conduct states: "Information relating to the operations and results of operations of the Company, past, present and future, its . . . employees, former employees, . . . business or customers, which has not been publicly disclosed or any information designated by Management as 'confidential' shall not be used by any [employee] except in the course of his or her employment or service with the Company."  Id. at 11-12.

42.     The Code of Conduct specifically prohibits the use or transmittal of confidential or proprietary information regarding the Company by former employees.  Id. at 31.

43.     In addition to the confidentiality obligations in the Code of Conduct, which are mandatory for all employees, certain key employees, who were granted restricted stock units, were required to enter into restrictive covenants as a condition of receiving the restricted stock units and in recognition of their key positions with the Company, including their access to confidential and proprietary information.  The restrictive covenants contained in the

restricted stock unit grant prevents key employees from competing with the Company for a limited time and from soliciting Radian customers and employees. Bolen, as a key employee, received a restricted stock unit grant and executed and accepted all the terms and conditions of the stock grant, including the restrictive covenant.

44.     The restrictive covenant ensures that Radian's competition does not receive any benefit from the Company's investment in Bolen, or the Company's trade secrets and confidential information.

45.     Radian recognizes the importance of its trade secrets and confidential information and takes appropriate steps to protect those interests.

**B.     Bolen Begins Working for Radian and Subsequently Enters into a Restrictive Covenant Agreement with Radian to Protect the Company's Trade Secrets and Confidential Information**

46.     Prior to joining Radian, Bolen had approximately ten years' experience in the mortgage insurance industry as an account manager with PMI.

47.     PMI operated as a strategic competitor of Radian through its own operating platform as well as its ownership interest in CMG Mortgage Insurance Co. Its activities in the mortgage insurance industry were substantially similar to Radian's in many ways and it competed with Radian for many of the same customers.

48.     However, on August 19, 2011, PMI announced publicly that it was precluded from writing new commitments of insurance.

49.     Notwithstanding PMI's preclusion from writing new mortgage insurance, CMG Mortgage Insurance Co. continued to write new mortgage insurance uninterrupted and it remains an active participant in the private mortgage insurance industry.

50.     On October 20, 2011, the Arizona Department of Insurance obtained a receivership order from the Arizona Superior Court, Maricopa County, granting the Arizona Department of Insurance full and exclusive possession and control of PMI.

51.     While in receivership, PMI supports its customers' ongoing claims, policy servicing and loss mitigation programs, subject to the Arizona receivership proceedings and orders; but it has not written new commitments of insurance since 2011.

52.     Bolen left her job at PMI in December 2011.

53.     In January 2012, she was hired by Radian as a Regional Account Manager.  Throughout her employment with Radian, Bolen worked in a role in which she was entrusted with confidential information and trade secrets as outlined herein.

54.     Bolen's job duties at Radian involved client relationships and sales.  In that position, Bolen was able to obtain knowledge of Radian's customer base and the Company's strategic planning across various markets to assess customers' future needs.  As just one example of the type of trade secrets and confidential information Bolen acquired during her employment at Radian, Bolen has intimate knowledge of Radian's competitive strategies for the mortgage insurance industry throughout the United States including Radian's current and future products and pricing.  Radian developed those strategies to identify and best service its customers and to determine new business opportunities in the United States mortgage insurance market.  Bolen also has knowledge of the key employees who have developed those strategies for Radian, as well as Radian's key pricing strategies and value-added activities.

55.     As another example of the trade secrets and confidential information Bolen acquired during her employment with Radian, Bolen, with the use of Radian resources, developed relationships with and knowledge of customers on behalf of Radian.  As a customer-

facing representative, Bolen learned customer needs and preferences, and traded upon the good will generated by Radian in cultivating those relationships.

56.     On or about September 21, 2012, Bolen entered into the Stock Unit Grant, attached hereto as Ex. B, whereby Radian agreed "to grant Restricted Stock Units to [Bolen]" and Bolen agreed "to accept such Restricted Stock Units, on the terms and conditions set forth" in the Stock Unit Grant.  Ex. B at RECITALS.

57.     Upon information and belief, Bolen conferred with legal counsel regarding the terms of the Stock Unit Grant, in particular the restrictive covenants set forth therein, prior to executing the Stock Unit Grant.

58.     As part of the Stock Unit Grant, Bolen agreed to certain restrictive covenants (the "Bolen Restrictive Covenants").  See id. § 8.

59.     The Bolen Restrictive Covenants prohibit Bolen, during her employment and for one year thereafter, from engaging "(directly or indirectly) in any employment or business activity whose primary business involves or is related to providing mortgage insurance within the United States."  Id. § 8(a).

60.     The Bolen Restrictive Covenants further prohibit Bolen, during her employment with Radian or at any time thereafter, from disclosing Radian's confidential information.  See id. § 8(c).  Bolen agreed that she would "keep all Confidential Information and Trade Secrets strictly confidential, and . . . comply with all applicable confidentiality policies of [Radian], including the Code of Conduct and Ethics."  Id.

61.     Bolen agreed that her "relationship with [Radian] is one of confidence and trust such that [she] has in the past been, and may in the future be, privy to Confidential Information and Trade Secrets of [Radian] or any of its Affiliates."  Id.

62.     Bolen agreed that she "shall not, either directly or indirectly through others: (i) solicit, divert, appropriate or do business with, or attempt to solicit, divert, appropriate or do business with, any customer for whom the Company or any of its Affiliates provided goods or services within 12 months prior to [her] date of termination or any actively sought prospective customer of the Company or any of its Affiliates for the purpose of providing such customer or actively sought prospective customer with services or products competitive with those offered by the Company or any of its Affiliates during [her] employment with the Company or any of its Affiliates, or (ii) encourage any customer for whom the Company or any of its Affiliates provided goods or services within 12 months prior to [her] date of termination to reduce the level or amount of business such customer conducts with the Company or any of its Affiliates." Id. § 8(d).

63.     Bolen agreed that "the business of [Radian] and its Affiliates is highly competitive, that the Confidential Information and Trade Secrets have been developed by [Radian] at significant expense and effort, and that the restrictions contained in [the Bolen Restrictive Covenants] are reasonable and necessary to protect the legitimate business interests of [Radian] and its Affiliates." Id. § 8(e).

64.     Bolen acknowledged that her "services are personal and unique and [she] has had and will continue to have access to and has become and will continue to become acquainted with Confidential Information and Trade Secrets, [and] the parties to this Agreement acknowledge and agree that any breach by [Bolen] of any of the covenants or agreements contained in [the Bolen Restrictive Covenants] will result in irreparable injury to [Radian] or any of its Affiliates, as the case may be, for which money damages could not adequately compensate such entity.  Therefore, [Radian] or any of its Affiliates shall have the right (in addition to any

other rights and remedies which it may have at law or in equity . . . to seek to enforce [the Bolen Restrictive Covenants] and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that [Radian] or any of its Affiliates may have for a breach, or threatened breach, of the restrictive covenants set forth in [the Bolen Restrictive Covenants]. [Bolen] agrees that in any action in which [Radian] or any of its Affiliates seeks injunction, specific performance or other equitable relief, [Bolen] will not assert or contend that any of the provisions of [the Bolen Restrictive Covenants] are unreasonable or otherwise unenforceable." Id. § 8(f).

65. The Bolen Restrictive Covenants are reasonable in both temporal and geographic scope.

### C. The Arch Defendants Seek to Enter the Mortgage Insurance Industry Through the Purchase of Certain PMI Assets

66. Defendant Arch Group is a Bermuda-based company that possessed approximately $5.75 billion in capital as of September 30, 2012; it provides insurance and reinsurance on a worldwide basis through its wholly owned subsidiaries. See Arch Group Press Release, Arch Capital Group Ltd. to Enter U.S. Mortgage Insurance Market Through Acquisition of CMG Mortgage Insurance Company and the Operating Platform of PMI Mortgage Insurance Co., February 8, 2013, attached hereto as Ex. C.

67. On February 7, 2013, Defendants Arch Services and Arch Group US, two wholly owned subsidiaries of Defendant Arch Group, entered into an Asset Purchase Agreement with the receiver of PMI, pursuant to which Arch Services and Arch Group US agreed to purchase certain assets from PMI's receiver, including PMI's interest in CMG Mortgage Insurance Company and PMI's mortgage insurance operating platform, CMFG Life Insurance Company, and related assets, from PMI. Id.

68.     According to the February 8, 2013 press release by Arch Group, the "transaction will allow [Arch Group] to enter the rapidly improving U.S. mortgage insurance marketplace and will broaden its existing mortgage insurance and reinsurance capabilities. [Arch Services] further announced that it expects to hire the current experienced senior management team and staff of PMI. [Arch Group's] global mortgage insurance and reinsurance operations will report to Marc Grandisson, Chairman and CEO of Arch Worldwide Reinsurance Group." See Ex. C.

69.     The February 8, 2013 press release discloses that "[t]he transaction will provide [Arch Services] with nationwide mortgage insurance licenses and a comprehensive mortgage insurance operating platform.  Additionally, [Arch Services] expects to enter into distribution and reinsurance agreements . . . [which will allow Arch Services to] gain significant access to the credit union marketplace immediately upon closing." See id.

70.     Arch Group Chief Executive Officer Constantine Iordanou explained the PMI purchase as follows: "We are extremely pleased to be able to provide a strong source of private capital to a U.S. mortgage insurance market in great need of capacity, subject to obtaining all required approvals.  We believe that this transaction, which is consistent with our strategy of moving into new specialty lines of business where we can hire experienced teams that fit our corporate culture, will allow us to capitalize on significant opportunities in the U.S. mortgage insurance marketplace.  The new operation will complement our existing European Union based mortgage insurance and global reinsurance operations, providing us with a platform to participate in mortgage insurance and reinsurance business on a worldwide basis." See id.

71.     According to the February 8, 2013 press release, Arch Group anticipates "that the transaction will close within 12 months, subject to approvals of the Arizona

receivership court, applicable regulators and government-sponsored enterprises (GSEs), including the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac), and the satisfaction of customary closing conditions." See id.

72.     Upon information and belief, once the final transaction to purchase the relevant PMI assets closes, the Arch Defendants will compete directly with Radian in the United States mortgage insurance industry.

73.     Upon information and belief, Arch Group and Arch Group US formed American corporate subsidiaries, including Arch Services and Arch Holdings, to operate the PMI assets and mortgage insurance operations.

74.     Upon information and belief, the Arch Defendants have hired numerous current and former employees of PMI.

75.     Upon information and belief, the Defendants, including Bolen, are actively recruiting for mortgage insurance sales positions.

**D.     The Arch Defendants Induce Bolen to Leave Her Employment, Bolen Refuses to Disclose Her New Employer to Radian, and Bolen Refuses to Affirm Her Commitment to Abide By Her Confidentiality Obligations and Agreement with Radian**

76.     On or about August 27, 2013, approximately six months after the Arch Defendants announced their intention to purchase CMG Mortgage Insurance Company and the mortgage insurance platform and related assets of PMI, Bolen informed Radian that she would end her employment with the Company.  She refused, however, to provide any information to Radian regarding her new employer.

77.     Multiple Radian representatives spoke with Bolen on August 27 and 28, 2013, regarding her resignation and future employment plans.  During the course of those

conversations, Bolen was asked to identify her new employer, but Bolen refused to do so. Radian representatives reminded Bolen of her confidentiality obligations and the requirements to comply with Radian's restrictive covenants and advised her of the Company's intent to enforce those obligations and covenants.

78.     On August 28, 2013, as a result of Bolen's refusal to disclose the identity of her new employer, Radian terminated Bolen's access to its computer network and systems and instructed Bolen to immediately ship all materials relating to Radian's business that were in her possession to Radian's corporate headquarters.  Bolen was separately instructed to ship her laptop computer to Radian's headquarters.

79.     While Bolen confirmed to Radian that she would comply with the instructions, she retained the materials and laptop computer for several more days, before returning the materials to Radian.

80.     In an attempt to further protect its interests and determine the identity of Bolen's new employer, Radian's counsel sent a letter to Bolen on or about August 30, 2013 to inform her that she was subject to the Bolen Restrictive Covenants and that employment with a competitor would constitute a breach of contract.  Radian's counsel stated further that Radian would take all legal actions available to enforce the Company's rights, including the filing of a lawsuit and a motion for injunctive relief.  A copy of that letter is attached hereto as Ex. D.

81.     Bolen never provided the requested assurance that she intended to comply with her ongoing confidentiality obligations pursuant to the Code of Conduct, applicable laws, and the Bolen Restrictive Covenants.

82.     On September 4, 2013, Radian finally received a package from Bolen that included Radian's laptop computer.

83. While Bolen's last day of work for the Company was August 28, 2013, Radian continued to pay Bolen's salary through her formal date of termination, September 10, 2013.

84. On or about September 25, 2013, Radian received information from the marketplace that suggested that Bolen had been hired by the Arch Defendants.

85. Upon information and belief, Bolen accepted the position of Regional Vice President of Field Sales with the Arch Defendants.

86. Upon information and belief, Bolen had been in contact with representatives of the Arch Defendants long before informing Radian that she would be resigning from the Company.

87. Upon information and belief, the Arch Defendants were aware that Bolen was a Radian employee with intimate knowledge of Radian trade secrets at the time it agreed to hire her.

88. Upon information and belief, the Arch Defendants made the decision to hire Bolen with the express intention of benefiting from her knowledge of Radian trade secrets as part of the Arch Defendants' stated intent to "capitalize on significant opportunities in the U.S. Mortgage insurance marketplace." See Ex. C.

89. Upon information and belief, the Arch Defendants were aware of the Bolen Restrictive Covenants at the time Bolen was hired and nonetheless pursued Bolen and induced her to engage in actions that violate her confidentiality obligations and the Bolen Restrictive Covenants.

90.     Upon information and belief, Bolen has accepted employment with the Arch Defendants and has engaged in competitive activity in violation of her confidentiality obligations and the Bolen Restrictive Covenants.

91.     The Arch Defendants would receive a tremendous unfair competitive advantage by employing Bolen during the period of her non-competition obligation.  The Arch Defendants would be able to trade upon Radian's relationships with its customers and the good will generated through years of work with these customers, without a significant investment of capital, time, and the physical materials that Radian invested in creating and servicing those relationships.  The Arch Defendants would also be able to gain insight into Radian's customers' business needs and how Radian meets those needs.

92.     Bolen would necessarily, if not inevitably, disclose Radian confidential information and trade secrets in performing work for the Arch Defendants.  By way of example, the Arch Defendants would learn Radian's customer intelligence, key employees and strategic analysis designed to serve Radian's customers and identify market trends without investing the hundreds of thousands of dollars, time commitment, or physical materials that Radian invested in creating those processes.  If the Arch Defendants assigned Bolen a job duty where it would be beneficial for her to utilize any of this knowledge, Bolen would necessarily, if not inevitably, rely upon the confidential information and trade secrets she learned at Radian and, just as importantly, what techniques do not work.  Bolen cannot forget her knowledge or be expected not to rely on her knowledge in the course of performing her duties for the Arch Defendants or any other competitor, and her new employer has a reasonable expectation that Bolen would provide it with a solution to a problem as cost-effectively as possible, even if Bolen's sole

knowledge of that solution is due to her exposure to Radian's trade secrets and confidential information.

93.    Upon information and belief, the Arch Defendants have assigned Bolen such job duties.  Upon information and belief, Bolen's job title with Radian is Regional Vice President of Field Sales.

94.    Radian will be irreparably harmed if Bolen is permitted to violate the Bolen Restrictive Covenants and Radian's Code of Conduct and provide services comparable to those she provided to Radian to the Arch Defendants or any other competitor.  The very purpose of the Bolen Restrictive Covenants and Radian's Code of Conduct is to ensure that Bolen would not present such a risk of harm to Radian.

95.    Radian must be afforded the benefit of the non-competition period so that Bolen's information can grow stale over time, and Radian can take the requisite measures to protect itself and to identify a replacement for Bolen and provide that replacement with at least some of the training, opportunities and resources the Company provided to Bolen.  Otherwise, the Arch Defendants will be able to unfairly compete by capitalizing on Bolen's knowledge of Radian's confidential information and trade secrets (which are not known to the general industry) without ever having made the type of investment that Radian has made to obtain success in the market.

96.    Bolen's efforts to circumvent her obligations to Radian by refusing to identify her new employer or even acknowledge whether the employer competes with Radian, as well as delaying the return of Radian property, clearly demonstrate that she is likely to compete with Radian and disregard her contractual, statutory and common law obligations to Radian.

97.     The Arch Defendants' stated intent to compete in the United States mortgage insurance markets and their efforts to induce Bolen to accept their employment offer in total disregard of the Bolen Restrictive Covenants and confidentiality obligations demonstrate that the Arch Defendants are likely to utilize Bolen's knowledge and encourage her to disregard her contractual, statutory and common law obligations to Radian.

98.     Although Radian cannot calculate the value of the actual and potential harm caused by Bolen's contravention of the Bolen Restrictive Covenants, the Arch Defendants' inducement of Bolen to contravene her contractual, statutory and common law obligations to Radian and Bolen's employment by a prospective competitor, it is clearly in excess of $75,000.00 given the value of the other trade secrets and confidential information that Bolen and the Arch Defendants can now use to compete with Radian.

### COUNT I
### <u>BREACH OF DUTY OF LOYALTY</u>

#### (Against Bolen)

99.     Paragraphs 1 through 98 are incorporated by reference as if fully set forth herein.

100.    Defendant Bolen was employed by Radian for a period of approximately eighteen months.

101.    Upon information and belief, Bolen agreed to leave her employment with Radian and work for the Arch Defendants in a similar employment capacity.

102.    Prior to announcing her resignation from Radian, Bolen emailed confidential customer intelligence of Radian to her personal email account, in violation of the Code of Conduct, including its confidentiality and use of company systems policies.

103. Bolen did not disclose her initial discussions with the Arch Defendants and refused to disclose to Radian that she would be accepting employment with the Arch Defendants in a position substantially similar to her position at Radian.

104. Upon information and belief, Bolen has approached at least one customer of Radian, and without disclosure to Radian, solicited the business of that customer for herself and the Arch Defendants.

105. On August 27, 2013, Bolen informed Radian that she was resigning her position at the Company, effective September 10, 2013.

106. Upon information and belief, since she informed Radian that she was resigning her position with the Company, Bolen has been soliciting Radian clients with the intention of inducing said clients to enter into business relationships with the Arch Defendants.

107. Bolen was accountable to Radian as an employee and owed Radian a duty to act for the benefit of the Company with loyalty and good faith, without any self-interest or self-dealing. Bolen further owed Radian a duty to keep any and all confidential information and trade secrets, including but not limited to Radian's client lists and strategic analysis that addressed the United States mortgage insurance industry, confidential.

108. Bolen breached her duty of loyalty owed to Radian by covertly planning to depart her employment with the Company and utilize Radian confidential information and trade secrets to benefit the Arch Defendants at the expense of Radian.

109. By virtue of Bolen's breach of her duty of loyalty owed to Radian, Radian has suffered damages.

## COUNT II
## BREACH OF THE BOLEN RESTRICTIVE COVENANTS/BREACH OF CONTRACT

### (Against Bolen)

110. Paragraphs 1 through 109 are incorporated by reference as if set forth fully herein.

111. Bolen continues to be bound by the Bolen Restrictive Covenants, which constitute an enforceable contract between her and Radian.

112. The Bolen Restrictive Covenants prohibit her from working for a competitor of Radian for a period of twelve months following her last day as an employee of Radian.

113. The Arch Defendants are or will be a direct competitor of Radian that provides services in the United States mortgage insurance industry.

114. Upon information and belief, Bolen has accepted employment with the Arch Defendants and her job duties for the Arch Defendants are or will be similar to her job duties while she was employed by Radian.

115. Upon information and belief, Bolen has repudiated the Bolen Restrictive Covenants and has thus breached her agreement with Radian by accepting employment with Radian's competitors, the Arch Defendants.

116. By breaching the Bolen Restrictive Covenants, Bolen has threatened immediate and irreparable harm to Radian.

117. Radian has no adequate remedy at law, and will continue to suffer substantial and immediate irreparable harm unless Bolen is enjoined as requested below.

118. Greater injury will be inflicted on Radian by the denial of the relief requested herein than will be inflicted on Bolen by the granting of this relief.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONSHIPS

### (Against Arch Defendants)

119.    Paragraphs 1 through 118 are incorporated by reference as if fully set forth herein.

120.    On or about August 14, 2012, Radian entered into the Stock Unit Agreement with Bolen.  Pursuant to that agreement, Bolen was granted restricted stock units from Radian.

121.    Also pursuant to the Stock Unit Agreement, Bolen agreed to the Bolen Restrictive Covenants, which prohibit her from working for a competitor of Radian or engaging in "any employment or business activity whose primary business involves or is related to providing mortgage insurance within the United States."

122.    Upon information and belief, the Arch Defendants were aware of the Bolen Restrictive Covenants and that employing Bolen would necessarily violate the terms of that agreement.

123.    Upon information and belief, the Arch Defendants have nonetheless offered Bolen employment and her job duties for the Arch Defendants are similar to her job duties while she was employed by Radian.

124.    Therefore, without legal justification, the Arch Defendants intentionally and improperly interfered with Bolen's performance of her contract with Radian by inducing her to breach the Bolen Restrictive Covenants and enter into employment with the Arch Defendants through which she has or will inevitably disclose Radian trade secrets.

125.    The Arch Defendants intend to enter into direct competition with Radian and induced Bolen to breach the Bolen Restrictive Covenants with an improper motive to injure Radian and to benefit its own business.

126.    As a result of the Arch Defendants' inducements, Bolen notified Radian on August 27, 2013 that she was leaving Radian.   Upon information and belief, Bolen has breached or will breach the Bolen Restrictive Covenants through her employment with the Arch Defendants.

127.    As a result of the conduct of the Arch Defendants, Radian has suffered and will continue to suffer lost profits and other consequential damages.

## COUNT IV
## MISAPPROPRIATION OF TRADE SECRETS – 12 PA. C.S.A. § 5302

### (Against All Defendants)

128.    Paragraphs 1 through 127 are incorporated by reference as if fully set forth herein.

129.    Upon information and belief, Bolen will, inevitably or intentionally, disclose to the Arch Defendants, or use on behalf of the Arch Defendants and for the Arch Defendants' exclusive benefit, confidential information and trade secrets of Radian without the express or implied consent of Radian.

130.    Upon information and belief, the Arch Defendants intended to, or had knowledge that they would inevitably, misappropriate Radian trade secrets through the hiring of Bolen.

131.    By virtue of the misappropriation of Radian's trade secrets by Bolen for the benefit of the Arch Defendants, Radian is threatened with immediate and irreparable harm.

132.    The conduct of Bolen has been willful and outrageous and undertaken with reckless indifference to the rights of Radian.

133.    The conduct of the Arch Defendants has been willful and outrageous and undertaken with reckless indifference to the rights of Radian.

134.    Greater injury will be inflicted upon Radian by the denial of the relief requested herein than will be inflicted on Bolen or the Arch Defendants by the granting of such relief.

## COUNT V
## TORTIOUS INTERFERENCE WITH BOLEN'S COMMON LAW OBLIGATIONS TO MAINTAIN RADIAN'S TRADE SECRETS AND CONFIDENTIAL AND PROPRIETARY INFORMATION

### (Against Arch Defendants)

135.    Paragraphs 1 through 134 are incorporated by reference as if fully set forth herein.

136.    In addition to any restrictive covenants, Bolen retains a common law obligation not to disclose Radian's trade secrets and confidential and proprietary information, as manifested by her assent to comply with Radian's Code of Conduct.

137.    The Arch Defendants have intentionally and without justification interfered with Bolen's common law obligations to safeguard Radian's trade secrets and confidential and proprietary information by hiring her into a position that will inevitably result in the disclosure of Radian's trade secrets and confidential and proprietary information.

138.    Radian has suffered and will continue to suffer injury and irreparable harm as a result.

## COUNT VI
## UNFAIR COMPETITION

### (Against All Defendants)

139.     Paragraphs 1 through 138 are incorporated by reference as if fully set forth herein.

140.     Defendants will inevitably engage in unfair competition due to Bolen's employment with Arch, despite her restrictive covenants, thereby utilizing Bolen's intimate knowledge of Radian's trade secrets and confidential and proprietary business information.

141.     Defendants' conduct will cause irreparable harm to Radian's goodwill, customer relations, market share and competitive advantage in the marketplace.

142.     Defendants' conduct is intentional, willful, outrageous and malicious, and justifies the imposition of punitive damages.

143.     Defendants' conduct constitutes unfair competition and has caused and will continue to cause Radian to suffer both measurable and immeasurable business injuries that cannot be sufficiently compensated with monetary damages.


### PRAYER FOR RELIEF

WHEREFORE, Radian requests the following relief:

(a)  Bolen be prospectively enjoined, for a period of twelve months following the separation from her employment with Radian, from accepting employment or otherwise performing services for the Arch Defendants or any other competitor of Radian.

(b)  The Arch Defendants be enjoined, for a period of twelve months following the separation from her employment with Radian, from hiring, employing or otherwise accepting services from Bolen.

(c)  Bolen be enjoined indefinitely from using or presenting any of Radian's trade secrets or proprietary and confidential information to any other party than Radian.

(d)  The Arch Defendants be enjoined indefinitely from using any of Radian's trade secrets or proprietary and confidential information that may have been obtained from Bolen.

(e)  Bolen be enjoined for a period of twelve months starting on the date she separated employment from Radian from soliciting, diverting, appropriating or doing business with any Radian customer for whom Bolen had contact or responsibility since September 10, 2012.

(f)  Bolen be enjoined for a period of twelve months starting on the date she separated employment from Radian from soliciting or inducing any Radian employee to accept employment with any competitor of Radian, including the Arch Defendants.

(g)  Bolen be directed to immediately return to Radian all Company documents and information, with the exception of documents and information pertaining to Bolen's personal compensation.

(h)  The Arch Defendants be directed to immediately return to Radian all Company documents and information that may have been obtained from Bolen.

(i)  The Arch Defendants be prohibited from using any Radian documents and information that may have been obtained from Bolen.

(j)   Bolen be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Preliminary Injunction and Other Relief.

(k)   The Arch Defendants be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Preliminary Injunction and Other Relief.

(l)   Bolen and the Arch Defendants be directed to pay actual damages, compensatory damages, punitive damages, pre-judgment interest, and post-judgment interest.

(m) Bolen and the Arch Defendants be directed to pay the costs of these proceedings.

(n)   This Court order such other and further relief, including attorneys' fees and costs, as it deems appropriate.

Dated: October 23, 2013

Respectfully submitted,

Larry L. Turner (PA I.D. No. 48351)
Michael C. Higgins (PA I.D. No. 90913)
MORGAN, LEWIS & BOCKIUS LLP
1701 Market Street
Philadelphia, PA 19103
215-963-5017/4877
215-963-5001 FAX
lturner@morganlewis.com
mhiggins@morganlewis.com

*Attorneys for Plaintiffs Radian Group Inc.*
*and Radian Guaranty Inc.*