**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RADIAN GUARANTY INC., | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | No. 13-6197 |
| v. | : | |
| | : | |
| RHIANNON BOLEN, et al., | : | |
| Defendants. | : | |

**June _19, 2014**                                                                                       **Anita B.**

**Brody, J.**

## MEMORANDUM

Plaintiff Radian Guaranty Inc. ("Radian") brings suit against Defendants Rhiannon Bolen

("Bolen"), Arch U.S. MI Services Inc. ("Arch MI Services") and Arch U.S. MI Holdings Inc.

("Arch MI Holdings") (collectively, the "Arch Defendants," and, collectively with Bolen,

"Defendants").  Radian alleges that Bolen, its former employee, violated a non-competition and

non-solicitation restrictive covenant with Radian and misappropriated Radian's trade secrets and

confidential information when she left Radian to work for the Arch Defendants.  Radian also

alleges that the Arch Defendants knowingly induced Bolen to join them in violation of the

restrictive covenant and with the express intent of benefiting from her knowledge of Radian's

trade secrets and confidential information.

On October 23, 2013, Radian filed suit against the Arch Defendants and Bolen, bringing

the following claims: (1) breach of the restrictive covenant under Delaware common law, against

Bolen; (2) breach of the duty of loyalty under Pennsylvania common law, against Bolen; (3)

tortious interference with contractual relations under Pennsylvania and Delaware common law,

against the Arch Defendants; (4) misappropriation of trade secrets under Pennsylvania statutory

law, against all Defendants; (5) tortious interference with the common law duty to maintain

confidential information under Pennsylvania common law, against the Arch Defendants; and (6)

unfair competition under Pennsylvania common law, against all Defendants.[1]  At the same time,

Radian moved for preliminary injunctive relief on all six claims,[2] but it did not respond to the

Court's invitation to immediately conduct a conference in the matter and did not request a

hearing on the motion until a conference on January 30, 2014.  By that time, the Court had taken

into consideration a motion to dismiss challenging the Court's jurisdiction over the Arch

Defendants and their parent companies.  After deciding that motion and determining that the

Court had jurisdiction over the Arch Defendants, the Court held a preliminary injunction hearing

on May 19 and 20, 2014, received post-hearing submissions from the parties, and now makes the

following findings of fact and conclusions of law.

## I.  FINDINGS OF FACT

### A.  The Private Mortgage Insurance Industry

The U.S. private mortgage insurance industry consists of approximately seven

companies, including Radian.  Tr. May 19, 165.   Radian has been providing private mortgage

insurance and related risk management products to mortgage lenders across the country for more

than 35 years.  *Id*., 64.  Private mortgage insurance products protect lenders in the event of

borrower default; private mortgage insurance is frequently required when a borrower makes a

down payment of less than 20 percent toward the purchase of a home.  *Id*., 46.

### B.  Bolen's Hiring and Role at Radian

In the fall of 2011, Bolen interviewed for a position at Radian with Angela Capone

("Capone"), Vice President Divisional Sales Southern Region at Radian, and Marshall Gayden

---

[1] I exercise subject matter jurisdiction over all of Radian's claims pursuant to 28 U.S.C. § 1332.
[2] Because I find a basis to enforce a preliminary injunction against Bolen on the breach of the restrictive covenant claim, I will not discuss the remaining claims.

("Gayden"), Senior Vice President, National Sales and Account Management at Radian.  *Id*., 53-59.  At the time, Bolen was employed as an account manager at PMI, a mortgage insurance company in competition with Radian.  *Id*.  During the course of her ten-year career with PMI, Bolen supported the North Texas region, interacting with senior-level executives of local lending institutions as well as branch-level processors, loan originators and underwriters for both national and local lenders.  Tr. May 20, 111-113.  Bolen was tasked with probing customers about their needs and preferences; building and maintaining her customer relationships; and writing new insurance.  *Id*., 112.  In addition to contacts developed at PMI, Bolen developed a significant number of customer relationships through her leadership of professional organizations supporting the mortgage industry in the North Texas region.  *Id*., 108.  By fall of 2011, however, PMI had been forced into "runoff" by its insurance regulator and was prohibited from writing new insurance.  Tr. May 19, 53-59.

Shortly after January 1, 2012, Bolen began working as a Radian Regional Account Manager.  Radian Regional Account Managers are primarily responsible for managing large customers with multiple branch offices that extend across state lines.  Tr. May 19, 51-53.  Bolen managed Radian's largest customers in the Southern Region and generated more than $650 million in business during 2012.  P-10.  During the course of her employment with Radian, Bolen was responsible for seventeen customer accounts; Bolen did not have a pre-existing business relationship with nine of these customers.[3]  P-30; Tr. May 20, 148.  Regional Account Managers are tasked with calling on the corporate officers of Radian's regional customers in an effort to determine how Radian could better serve them and better coordinate the efforts of regular Account Managers assigned to those customers.  She regularly visited corporate offices

---

[3] Those customers with which Bolen did not have a prior business relationship are Iberia Bank Mortgage, Envoy, Cornerstone, SWBC, DHI, First Continental, Acopia, Evolve Bank and Trust and Pacific Union.

and local branches, making 35 to 45 customer calls each month.  P-10; Tr. May 19, 48-51.  In particular, Ms. Bolen's responsibilities included learning the business strategy for each customer and identifying areas in which Radian could provide specific value; identifying new business opportunities for Radian's pricing, products, and programs; facilitating confidential in-depth risk reviews for Radian customers including, where necessary, working with internal Radian risk managers; acting as a liaison to Radian customers to aid with claims, rescissions, and other servicing needs; and creating strategies for each individual customer, and participating in communications regarding the strategy for multiple Account Managers and clients.  P-3; Tr. May 19, 67-69.  More informally, Bolen's job was to "get in the weeds" with the customer, to "get to know them inside out."  Tr. May 19, 171.

    In performing her duties, Bolen was exposed to a wide variety of information that Radian considers confidential.  Most importantly, as a result of its long-term, carefully-cultivated customer relationships, Radian holds significant information regarding nationwide customer contacts, preferences, business metrics, and NIW with Radian and its competitors.  Tr. May 19, 70-72.  While some mortgage insurance industry data such as mortgage production rates and NIW are available for purchase from public databases, Radian account managers at all levels invest significant time into the cultivation of more detailed customer knowledge.  *Id*., 122-123.  Radian stores this information in a password-protected customer relationship management system provided by Salesforce.com.  P-13A.  Through her Radian login credentials, Bolen had access to all of the information and data within Salesforce.com related to Radian's entire customer base.  Tr. May 19, 70-72.  Radian's version of Salesforce.com also contains customized pricing information on Radian products such as lender-paid mortgage insurance and contract underwriting.  *Id*., 70-72.  While mortgage insurance companies are required to file their

rates for standard insurance products with state regulators, Radian keeps pricing for these unique products confidential. *Id.*, 118.  Bolen was also involved in confidential account update presentations that included Radian's internal analyses of a customer's performance based on Radian's own confidential information.  Tr. May 20, 18-21; P-18; P-19.  Radian, like many other mortgage insurance companies, is also in the process of integrating its technology platform with the loan origination systems used by mortgage bankers; Bolen was exposed to Radian's efforts to build that technology.  *Id.*, 89-90.  In her role as Regional Account Manager, Bolen was also privy to confidential internal discussions regarding changes to Radian's credit strategy and generally aware of Radian's internal strengths and vulnerabilities.  *Id.* at 78-79.

### C.  The Restricted Stock Unit Agreement and the Restrictive Covenant

On or about August 12, 2012, more than seven months after she began working for Radian, Radian presented Bolen with a Restricted Stock Unit Grant ("RSU Agreement") as a part of a 2012 Special Recognition Sales Incentive Award ("Award").  P-9; P-16.  The Award included restricted stock in Radian Group Inc., Radian's corporate parent, valued at $20,000 that would vest in three years.  *Id*.  The Award was contingent on Bolen's continued employment and her acceptance of various terms and conditions, including a non-competition and non-solicition restrictive covenant in the RSU Agreement with non-competition and non-solicitation provisions.  *Id*.

Section 8 of the RSU Agreement entitled "Restrictive Covenants" also contains the following provisions:

- § 8(a): Bolen "acknowledges and agrees that, during [Bolen's] employment with [Radian], and for the 12 month period following [Bolen's] termination of employment for any reason ("the Restrictive Period"), [Bolen] will not, without [Radian's] express written consent, engage (directly or indirectly) in any employment or business activity whose primary business involves or is related to providing mortgage insurance in the United States."

- § 8(a): "[G]iven the nature of [Radian's] business, a nationwide geographic scope [for the restrictive covenants] is appropriate and reasonable."

- § 8(b): The terms "Confidential Information" and "Trade Secrets" mean "information that [Radian] owns or possesses, that [Radian has] developed at significant expense and effort, that [Radian] use[s] or that is potentially useful in the business of [Radian], that [Radian] treats as proprietary, private or confidential, and that is not generally known to the public."

- § 8(b): Bolen's "relationship with Radian is one of confidence and trust such that [she] has in the past been, and may in the future be, privy to Confidential Information and Trade Secrets of [Radian]."

- § 8(c): Bolen "covenants and agrees that during the term of the [Bolen's] employment by Radian and during the Restrictive Period, [Bolen] shall not, directly or indirectly through others, hire or attempt to hire any employee of [Radian] . . . ."

- § 8(d): Bolen "covenants and agrees that during the term of the [Bolen's] employment by Radian and during the Restrictive Period, [Bolen] shall not, directly or indirectly through others, solicit, divert, appropriate or do business with, or attempt to solicit, divert, appropriate or do business with, any customers for whom [Radian] provided goods or services within 12 months prior to the Grantee's date of termination . . . ."

- § 8(e): "[T]he business of [Radian] is highly competitive, that the Confidential Information and Trade Secrets have been developed by [Radian] at significant expense and effort, and that the restrictions . . . are reasonable and necessary to protect the legitimate business interests of [Radian]."

- § 8(f): "Because [Bolen's] services are personal and unique and [Bolen] has had and will continue to have access to and has become and will continue to become acquainted with Confidential Information and Trade Secrets, the parties to this Agreement acknowledge and agree that any breach by [Bolen] of any of the covenants or agreements . . . will result in irreparable injury to [Radian] for which money damages could not adequately compensate such entity."

Radian notified Bolen that she was not required to accept the Award and that there would be no other employment consequences as a result of her decision to forfeit it. Tr. May 19, 196-198. Bolen conferred with her personal attorney about the RSU Agreement and discussed it with Capone and Karen Chung from Radian's Human Resources Department. Tr. May 20, 7-11. Bolen ultimately accepted the Award subject to the terms and conditions of the RSU Agreement including the restrictive covenant.

6

### D.  Bolen's Recruitment and Hiring By the Arch Defendants

Approximately one year later, on August 1, 2013, while still employed at Radian, Bolen meet with Richard Izen ("Izen"), the Executive Vice President of Sales & Marketing for the Arch Defendants, to interview for employment with Arch MI Services.  Tr. May 20, 50-51.  At the time of the interview, Arch Defendants were preparing to enter the U.S. mortgage insurance market.[4]  On the eve of her interview with Izen, Bolen accessed Radian's Salesforce.com system from her personal computer and downloaded at least one spreadsheet named "Contact Mailing List Report" that contained confidential contact information for almost 1,000 Radian customer contacts across the country, many of which were not within her group of assigned customers.  P-13A; Tr. May 20, 23-28.

After a series of further conversations, the Arch Defendants offered Bolen a position with their new U.S. sales team.  P-24.  Arch was well aware of Bolen's restrictive covenant with Radian when they offered her the position.  P-25.  On August 26, 2013, Bolen accepted the Arch Defendants' offer.  Tr. May 20, 53-55.  On August 27, 2013, Bolen sent from her Radian iPad to her personal email account notes containing confidential business insights on at least six Radian customers.  P-27.  Some of the customers discussed in this email were assigned to Bolen by Radian, but a number were Radian customers to whom she was not assigned.  Tr. May 20, 60-62. On the same day, Bolen notified Radian's Capone by phone that she was resigning her employment with Radian, and she subsequently sent Capone an email attaching a letter of resigniation.  Tr. May 19, 198-201, P-11.  On August 28, 2013, Radian severed Bolen's access to Radian's systems and requested that Bolen return her Radian laptop computer and any other Radian materials in her possession.  *Id*., 151-154.  On September 13, 2013, Bolen sent an email

---

[4] On or about January 30, 2014, Arch MI Services formally acquired CMG Mortgage Insurance Company ("CMG") from CMG's former owner PMI and also purchased PMI's mortgage insurance platform and related assets.  Tr. May 19, 116-117.

to Capone returning more than 20 Radian files stored on her personal computer.  P-33.  As far as Radian has ascertained, Bolen has not retained any Radian electronic devices or documents.  Tr. May 20, 136, 160-161.

**E.  Bolen's Role with the Arch Defendants**

On or before September 9, 2013, Bolen started working with the Arch Defendants as Regional Vice President in Arch's South Region covering Texas, New Mexico, Arizona, Oklahoma, Louisiana, Arkansas, and Mississippi.  P-24; P-30; Tr. May 20, 135.  Her primary responsibilities are to recruit, hire, and manage the account managers who report to her; she does not have direct responsibility for customer accounts.  Tr. May 20, 135.  At the time of her hire, Arch and Bolen agreed that Bolen would not work in a client-interfacing capacity, but rather focus her efforts on recruiting, hiring and managing the account representatives in her region.  *Id*. Arch and Bolen further agreed that Bolen would not provide services to any of the customers with whom she developed new relationships at Radian for the duration of the period covered by the restrictive covenant in the RSU Agreement.  Tr. May 20, 103-104.  With respect to these customers, Bolen and Arch also agreed that Bolen would not manage any of the account managers who may have contact with those customers.  Bolen has complied with her agreement not to solicit customers with whom she did not have a relationship prior to her time with Radian. *Id*., 105.  Bolen did, however, provide to Arch's Izen the email contact information for corporate-level customer contacts that she developed while at Radian.  P-32.

Although Bolen has been working for Arch for nearly nine months, Radian cannot identify any loss of market share or loss of business as a result of Bolen's employment with Arch.  Tr. May 19, 99-100.  At this time, Arch is not yet writing NIW and is in the process of securing insurance policies with institutional lenders.  Tr. May 20, 139-140.  Before a lender

8

becomes a customer of a mortgage insurance company, the lending institution must enter into a master insurance policy with the mortgage insurance company, setting forth the general terms and conditions for any future polices that may be written.  Tr. May 19, 67-68.  Radian is aware of one customer, NTFN, that has signed a master policy with Arch.  *Id*., 93.[5]  As of yet, Radian cannot identify any lost business from NTFN as a result of NTFN's signing of a master policy with Arch; institutional lenders, such as NTFN, maintain master insurance policies with multiple mortgage insurers.  Tr. May 19, 125, 128.   Because of the extended sales cycle required to acquire customers, sign master policies and extract business from those customers, a start-up like the Arch Defendants will not immediately be able to demonstrate NIW, but their activities eventually may yield new business.  Tr. May 19, 99.

## II.  CONCLUSIONS OF LAW

"In determining whether to grant a preliminary injunction [pursuant to Federal Rule of Civil Procedure 65(a)], a court must consider whether the party seeking the injunction has satisfied four factors: (1) a likelihood of success on the merits; (2) he or she will suffer irreparable harm if the injunction is denied; (3) granting relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief."  *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 109 (3d Cir. 2010).  "Although the right upon which this cause of action is based is state-created, Rule 65(a) of the Federal Rules of Civil Procedure contemplates a federal standard as governing requests addressed to federal courts for preliminary injunctions."  *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 799 (3d Cir. 1989).

### A.  Likelihood of Success on the Merits

Radian alleges that Bolen breached the non-competition and non-solicitation restrictive

---

[5] Bolen had a pre-Radian business relationship with NTFN by virtue of her employment with PMI.  P-30.

covenant in the RSU Agreement.[6]  "To be enforceable, a covenant not to compete must (1) meet general contract law requirements, (2) be reasonable in scope and duration, both geographically and temporally, (3) advance a legitimate economic interest of the party enforcing the covenant, and (4) survive a balance of the equities." *Am. Homepatient, Inc. v. Collier*, No.  274-N, 2006 WL 1134170, at *2 (Del. Ch. Apr. 19, 2006).

With respect to the first prong of meeting general contract requirements, the Court has already ruled that the RSU Agreement is a valid, enforceable contract under Delaware law.  Tr. May 19, at 17, 30, 35.  Prior to the hearing on Radian's motion for a preliminary injunction, Defendants challenged the enforceability of the contract on the basis that the Award was illusory consideration in exchange for Bolen's consent to the RSU Agreement, and thus, because there was no consideration, the restrictive covenant in the RSU Agreement was not enforceable. Under Delaware law, a restrictive covenant entered into after an employee's service begins is enforceable if supported by new consideration in the form of a corresponding benefit or a beneficial change in employment status.  *Faw, Casson & Co. v. Cranston*, 375 A.2d 463, 466 (Del. Ch. 1977); *All Pro Maids v. Layton*, No. 058-N, 2004 WL 1878784, at *3 (Del. Ch. Aug. 9, 2004) (holding that retention of an employee at will, in exchange for a covenant not to compete, constitutes consideration sufficient to support the covenant); *UAP Holding Corp. v. Maitoza*, No. 06-1332, 2008 WL 1868628, at *3 (W.D. Wash. Apr. 22, 2008) (applying Delaware law and finding that stock rights obtained by an employee constituted sufficient consideration for restricted covenants contained within the stock option agreement).  Thus, under Delaware law, even though Bolen's Award of restricted stock did not vest for three years, this consideration is adequate to create an enforceable agreement.  *See Newell Rubbermaid Inc. v. Storm*, No. 9398–VCN, 2014 WL 1266827, at *8-9 (Del. Ch. Mar. 27, 2014) (enforcing a non-competition

[6] The RSU Agreement provides and all parties agree that Delaware law applies.  P-16 § 13.

agreement where the employee received RSUs under an equity share plan that vested

incrementally over a period of several years, and rejecting the defendant's arguments that the

provision was unenforceable because the consideration was illusory).

        With respect to the second prong regarding geographic and temporal reasonableness,

Delaware law generally supports the reasonableness of one-year non-compete provisions and the

nationwide-scope of these restrictions.  *Collier*, 2006 WL 1134170, at *2 n.5; *O'Leary v.

Telecom Res. Serv., LLC*, No. 10C–03–108–JOH, 2011 WL 379300, at *5 (Del. Super. Ct. Jan.

14, 2011) ("Delaware courts and other jurisdictions have permitted a nationwide non-compete

covenant in certain circumstances and are not averse to broad geographical scopes when they are

necessary to protect the legitimate business interest of the party trying to enforce the covenant.").

In this case, there is no evidence to suggest that the temporal and geographic scope of the

restrictions is unreasonable.  Moreover, Bolen agreed in the RSU Agreement that "given the

nature of [Radian's] business, a nationwide geographic scope is appropriate and reasonable."  P-

16 § 8(b).  Bolen argues that the scope of the restrictive covenant barring employment in any

business related to providing mortgage insurance within the United States is substantively

overbroad, but the provision appears appropriate with respect to a direct competitor in the

mortgage insurance industry such as the Arch Defendants.[7]  Thus, the enforceability of the RSU

Agreement's restrictive covenant hinges upon the two final prongs: whether it protects a

legitimate economic interest and whether it survives a balancing of the equities.

### 1.  Legitimate Economic Interest

        "A non-competition agreement will only be enforced to protect the legitimate economic

interests of the employer.  Interests which the law has recognized as legitimate include protection

---

[7] The Court has the power to "blue pencil" the Agreement to make it enforceable.  *See, e.g.*, *Elite Cleaning Co., v. Capel*, No. 690-N, 2006 WL 4782306, at *8-9 (Del. Ch. June 2, 2006); *RHIS, Inc. v. Boyce*, No. 18924, 2001 WL 1192203, at *7 (Del. Ch. Sept. 26, 2001).

of employer goodwill and protection of employer confidential information from misuse."
*Research & Trading Corp. v. Pfuhl*, No. 12527, 1992 WL 345465, at \*12 (Del. Ch. Nov. 18,
1992). "American courts insist that an employer may not enforce a post-employment restriction
on a former employee simply to eliminate competition per se; the employer must establish a
legitimate business interest to be protected." *Hess v. Gebhard & Co. Inc.*, 808 A.2d 912, 918
(Pa. 2002).

The restrictive covenant is necessary to protect Radian's legitimate business interests in
both its goodwill and confidential information. With respect to the former, courts have long
recognized that an employer has an interest in the goodwill created by its sales representatives
and other employees, which is vulnerable to misappropriation if the employer's former
employees are allowed to solicit its customers shortly after changing jobs. *See Knowles-Zeswitz
Music, Inc. v. Cara,* 260 A.2d 171, 175 (Del. Ch. 1969). "In recognition of the employer's right
to preserve its customer relationships from misappropriation, this court has repeatedly enjoined
former employees from dealing with the customers of their former employers with whom the
employee had contact." *Pfuhl*, 1992 WL 345465, at \*12.

In this case, Radian's legitimate business interest in protecting its goodwill requires that
Bolen will not solicit clients whom she met through Radian for the duration of the restrictive
covenant period. However, a former employer has a legitimate business interest only in
protecting the client relationships developed while the employee was under their employ. *See*,
*e.g.*, *BDO Seidman v. Hirshberg*, 712 N.E.2d 1220 (N.Y. 1999) (restrictive covenant would be
enforced only as to information and customer relationships developed during the employee's
employment with that employer) ("Extending the anti-competitive covenant to BDO's clients
with whom a relationship with defendant did not develop through assignments to perform direct,

substantive accounting services would, therefore, . . . constitute a restraint 'greater than is needed to protect' these legitimate interests").  Therefore, the restrictive covenant does not prohibit Bolen from soliciting customers that she knew at PMI prior to joining Radian.

To justify the non-competition provision, Radian argues that Bolen had access to Radian's confidential information, in particular its customer information stored on Salesforce.com, as well as its business practices and strategies that must be protected from misuse.  The RSU Agreement defines and stipulates that Bolen had access to Radian's confidential information.  *Id*.  Despite this language, Defendants argue that the information in question is not actually confidential and that she retains neither copies nor detailed recollections of the information.  In particular, Defendants argues that the data in the Salesforce.com system is not confidential because it is actually customer data provided to Radian or is available for purchase from public databases.

In *Intermetro Indus. Corp. v. Kent*, an action seeking to enforce a non-compete, defendant Kent contended that much of his former employer Metro's information was not confidential.  *Intermetro Indus. Corp. v. Kent*, No. 07-0075, 2007 WL 1140637, at *5 (M.D. Pa. Apr. 17, 2007).  Metro's customers and prospective customers are readily obtained from trade journals and telephone listings or are generally known by people in the industry.  Customer lists are not protectable when they can be "easily ascertained from sources already in the public domain."  *Del. Express Shuttle v. Older*, No. 19596, 2002 WL 31458243, at *18 (Del. Ch. Oct. 23, 2002); *see also* Restatement (Third) of Unfair Competition § 42 ("A customer list is not protectable as a trade secret . . . unless it is sufficiently valuable and secret to afford an economic advantage to a person who has access to the list.")  Nevertheless, the court found that because Metro territory managers spend much of their time identifying prospective customers by

13

reviewing trade publications or searching the Internet, Metro had made a "material investment of [its] time and money" to compile its list of prospective clients. *Kent*, 2007 WL 1140637, at *5. The court continued: "Allowing a competitor to make use of this information without making a similar investment in time and money would place Metro at a competitive disadvantage. Metro, therefore, has a protected interest in this information." *Id; see also Miles, Inc. v. Cookson Am., Inc.,* No. 12-310, 1994 WL 676761 (De. Ch. No. 15, 1994) ("An alleged trade secret derives actual or potential independent economic value if a competitor cannot produce a comparable product without a similar expenditure of time and money. This requirement . . . involves the notion of competitive advantage. It focuses on whether a plaintiff would lose value and market share if a competitor could enter the market without substantial development expense."). Kent also attempted to diminish the importance of his knowledge of Metro's strategic plans, pricing practices, product margins, and product development by arguing that Metro's plans only involved general profit goals and that he did not remember specific prices, discounts, or margins. "While the Court does not doubt that Mr. Kent retains only a general understanding of Metro's strategy, pricing options, profit margins, and product information, this general information still is valuable and is not generally known to the public." *Id*; *see also WebMD Health Corp. v. Dale*, No. 11-5827, 2012 WL 3263582 (E.D. Pa. Aug. 10, 2012) (finding that where defendant Dale learned confidential information about WebMD's pricing, pricing strategies, marketing strategies, product development, market research, and strengths and weaknesses while employed there, and he acknowledged as much in writing, a non-competition agreement was enforceable despite the fact that Dale disputed whether the information he learned was actually confidential, whether it would be useful to him in his new job, and whether he still remembered sufficient details to pose any threat to WebMD). *Id*. at n. 5.

14

In this case, in addition to stipulating to the fact that she was privy to Radian's confidential information and that the restrictive covenants were necessary to protect Radian's business interests, Bolen had access to Radian's carefully-cultivated customer information on Salesforce.com.  Although some of the information may be publicly available for purchase or shared by lenders with Radian and other mortgage insurance companies, Radian's investment in the cultivation and protection of this list is dispositive of its confidential status.  Allowing other companies in the industry particularly new entrants would make use of it would put Radian at a competitive disadvantage.  Moreover, Bolen was privy to how Radian designs its credit policy; the status and strategy of Radian's loan origination system efforts; and how Radian triangulates and analyzes various sources of market data to determine its market share; and the development of its sales strategy.  Radian has spent years developing these best practices, at significant expense, and none of it is publicly available or shared with the public.  For these reasons, Radian has a legitimate business interest in protecting its confidential information sufficient to support the enforceability of the non-compete provision in the RSU Agreement's restrictive covenant.

### 2.  Balancing of the Equities

"Balancing the equities requires the Court to look to the actual situation confronted by the parties at the time specific enforcement is sought and to weigh the potential harm to the company's legitimate economic interests against the employee's freedom, absent the covenant not to compete, to work in whatever job he chooses."  *Dale*, 2012 WL 3263582, at *9 (citing *Pfuhl*, 1992 WL 345465, at *13).  "If it appears that the interests the employer seeks to protect are slight or ephemeral while the consequences of specific enforcement to the employee are grave, equity may well leave the plaintiff to pursue his legal remedies and decline to grant the special remedy of injunction."  *LewMor, Inc. v. Fleming,* No. 8355, 1986 WL 1244, at *2 (Del.

15

Ch. Jan. 29, 1986).  "This balancing of harms is an essential factor . . . particularly in the employment context where the financial harm that could come to an employee seeking to support himself and his family weighs against mechanically enforcing restrictive covenants."  *Stenz*, 2000 WL 1716760, at *4; *see also Fleming*, 1986 WL 1244, at *5 (declining to enforce a non-compete where defendant was unlikely to be a significant competitive threat and where the impact on defendant, a single woman with few assets and no car reliant on employment as sole means of financial support, would be "grave").  On the other hand, Delaware's "respect for private contracts," which mandates that all valid agreements, including non-competes, "be enforced according to [their] plain terms."  *Hough Associates, Inc. v. Hill*, 2007 WL 148751, at *18 (Del. Ch. Jan. 17, 2007).

Here, the equities favor holding Bolen to the RSU Agreement to which she freely agreed. Bolen contemplated the RSU Agreement for days, discussed it with her personal lawyer, and knew that she was in no danger of losing her job with Radian if she chose not to sign the agreement.  Tr. May 19, 196-98; Tr. May 20, 7-11.  Bolen sought employment with the Arch Defendants knowing that she was subject to the restrictive covenant and the Arch Defendants were aware of that fact before they offered her a job; nevertheless, the Arch Defendants and Bolen pursued a new employment arrangement.  In this action, the Arch Defendants are paying Bolen's legal fees and have indicated to Bolen that they will support her financially in the event that she is enjoined from working for them.  May 20 Tr., 146-147.

The Court will not, however, grant Radian's request to start the one-year restrictive covenant period on the date of the Court's order on Radian's motion for a preliminary injunction. As Defendants have emphasized, Radian is responsible for the failure to pursue a preliminary injunction at an earlier date, and there is no reason to extend the terms of the restrictive covenant.

### B.  Irreparable Harm

Irreparable harm is "a potential harm which cannot be redressed by a legal or equitable remedy following a trial." *Instant Air Freight Co.*, 882 F.2d at 801.  The requisite for injunctive relief has been characterized as a "clear showing of immediate irreparable injury," or a "presently existing actual threat; [an injunction] may not be used simply to eliminate a possibility of a remote future injury . . . ." *Acierno v. New Castle County,* 40 F.3d 645, 655 (3d Cir. 1994). In a breach of contract action, loss of income is not sufficient to show irreparable harm, but the Court will consider " '(a) the difficulty of proving damages with reasonable certainty, (b) the difficulty of procuring a suitable substitute performance by means of money awarded as damages, and (c) the likelihood that an award of damages could not be collected.' " *Id.* at 802 (*quoting* Restatement (Second) of Contracts § 360 (1981)).

The parties dispute whether Radian will suffer irreparable harm without a preliminary injunction preventing Bolen from working for the Arch Defendants in addition to the existing standstill agreement preventing her from soliciting customers or managing account representatives that seek to do business with those customers.  Radian emphasizes the acknowledgment by Bolen in the RSU Agreeement that "any breach by [Bolen] of any of the covenants or agreements . . . will result in irreparable injury to [Radian] for which money damages could not adequately compensate such entity."  P-16, § 8(f).  Although "the parties to a contract cannot, by including certain language in that contract, create a right to injunctive relief where it would otherwise be inappropriate," *Firemen's Ins. Co. of Newark v. Keating,* 753 F.Supp. 1146, 1154 (S.D.N.Y. 1990), such a provision is generally weighs in favor of a finding of irreparable harm by courts within this District.  *See*, *e.g.*, *WebMD Health Corp. v. Dale*, 2012 WL 3263582, at *12 (E.D. Pa. Aug. 10, 2012) ("Here, Mr. Dale stipulated in the Agreement

17

[controlled by Delaware law] that employment with a Competitive Business would constitute irreparable harm warranting injunctive relief, one factor that weighs in favor of finding irreparable harm."); *Quaker Chem. Corp. v. Varga*, 509 F. Supp. 2d 469, 479 (E.D. Pa. 2007) (The Court found that the moving party will likely suffer irreparable harm based in part on a stipulation in the restrictive covenant, subject to Pennsylvania law, that "in the event of a breach or threatened breach . . . of the restrictive covenant . . . Quaker will suffer irreparable harm, and monetary damages may not be an adequate remedy."). *C.f. Baker's Aid v. Hussmann Foodservice Co.,* 830 F.2d 13, 16 (2d Cir. 1987) (affirming denial of preliminary injunction and noting that there is "no authority in support of the proposition that irreparable harm must inevitably be assumed in breach of covenant cases," and that it is not an automatic process, "but instead depends upon the factual particulars in each case").

Turning to the facts of this case, Defendants emphasize that the agreement in place between Bolen and the Arch Defendants eliminates any potential threat to Radian of damage to the customer relationships Bolen developed while in Radian's employ.  Defendants also argue that Radian has failed to establish that Bolen has retained any information belonging to Radian that she can use to compete unfairly with Radian.  Defendants emphasize that Radian has not lost sales or market share due to Bolen's actions in the last nine months since she joined Arch Defendants.

In *National Business Services, Inc. v. Wright,* 2 F.Supp.2d 701 (E.D. Pa.1998), this court found a threat of irreparable harm and enjoined a defendant from working for a competitor even though the defendant offered to limit customer contacts and not make use of the plaintiff's confidential information.  During the course of her three year employment with plaintiff ASI, defendant Wright developed relationships with many of ASI's customers and potential

customers, and she had access to customer information, including which customers had stopped purchasing ASI's products and why. *Id*. at 705.  Wright also entered into an employment agreement with ASI that restricted her from soliciting ASI's customers, competing with ASI, or disclosing any of ASI's confidential information. *Id*. at 704.  Wright subsequently left ASI to work for a competitor, performing sales and marketing duties. *Id*. at 706.  The court enjoined Wright from working at the competitor, even though Wright stated that she would limit her customer contacts and refuse to make use of ASI's confidential information. *Id*. at 708.  The court reasoned that Wright's "every decision would be informed by the information she acquired at" ASI. *Id*.  It also noted that "[e]ven if Wright did not have direct contact with customers, [the competitor] could publicize its employment of Wright in order to capitalize on ASI's goodwill." *Id*.  The court continued:

> Wright also has a wide-ranging knowledge of ASI's business, products and customers, which would be impossible for her not to call on if she was working for ASI's direct competitor. As an employee of [the competitor], Wright's duties will certainly be in conflict with ASI's objectives, which are to sell its products and services and promote its goodwill. The potential injury to ASI's goodwill and the potential use of ASI's confidential information constitutes irreparable harm.

*Id*.  at 709.

Similarly, in *Telamerica Media Inc. v. AMN Television Mktg.*, No. 99-2572, 1999 WL 1244423 (E.D. Pa. Dec. 21, 1999), defendant Gray, the former President of TelAmerica, had begun competing directly with TelAmerica in the cable program market through his new employer AMN. *Id*. at *1.  As a result of his previous position, Gray was in possession of critical information regarding TelAmerica's business practices and relationships with cable system operators and advertising agencies. *Id*. at *6.  This information would not have been available to AMN but for Gray's prior relationship with TelAmerica.  Although AMN tried to argue that any injury could be compensated through money damages, the Court found that a jury

would have great difficult assessing the likely damage to TelAmerica's future relationships with advertisers. Further, it would be next to impossible to determine to what extent Gray and AMN used confidential information to gain a business advantage versus business obtained via normal competitive channels. "These factors, combine with the fact that the Non–Compete Agreement explicitly states that damages are inadequate and that the parties agree to an injunctive remedy, weigh heavily in favor of a finding of irreparable injury." *Id. See also Healthcare Servs. Grp., Inc. v. Fay*, CIV.A. 13-66, 2013 WL 2245683, at *8 (E.D. Pa. May 22, 2013) (finding that a prohibition on client solicitation and the use of confidential information was insufficient to prevent unfair competition by two former executives because every decision they made at their new employer would be informed by their many years at their previous employer and their mere presence at sales meeting helped their new employer establish goodwill with their existing customers); *Dale*, 2012 WL 3263582, at *12 ("Because he was exposed to confidential information about WebMD's sales, marketing, and pricing strategies, Mr. Dale would be likely to use that information, either consciously or not, when competing against WebMD in selling online advertising.").

Thus, regardless of any standstill agreement prohibiting solicitation of former customers and any promises not to use confidential information, Bolen's knowledge of Radian's strengths, weaknesses and business practices necessarily inform the way that she is managing her current Arch sales team and the way that she is now competing for business with Radian. Furthermore, Defendants ignore the fact that Bolen shared with another Arch executive confidential contact information for senior executives at key Radian regional customers whom she worked with during her tenure at Radian but with whom she had no pre-existing corporate level relationships. *Compare* P-30 *with* P-31. The solicitation of Radian's customers even by other Arch employees

will make it more difficult for the new Radian Regional Account Manager in Bolen's former position to obtain business from these customers.  Arch will have the inside track to these customers simply by virtue of Bolen's previous position as their point of contact for mortgage insurance and by virtue of Arch's ability to publicize Bolen's position as a new member of its mortgage insurance sales team.  Based on these facts in combination with the stipulation to irreparable harm in the RSU Agreement, irreparable injury exists for the purposes of a preliminary injunction.

### C.  Not Result in Greater Harm to the Non-Moving Party

For the same reasons discussed when balancing the equities of enforcing the RSU Agreement, the Court finds that any harm to Bolen would be outweighed by the harm to Radian should the Court choose not to specifically enforce the RSU Agreement.  At this point, Bolen will be enjoined from working for the Arch Defendants for a little more than two months.  The Arch Defendants are paying Bolen's legal fees and have indicated to Bolen that they will support her financially during the time that she is out of work.  Tr. May 20, 146-147.   Therefore, any potential harm to Bolen will not outweigh the potential harm to Radian as a result of her employment with the Arch Defendants.

### D.  In the Public Interest

Granting the preliminary injunction in this case will serve the public interest by "discourag[ing] unfair competition, the misappropriation and wrongful use of confidential information and trade secrets, and the disavowal of freely contracted obligations."  *Graphic Mgmt. Assoc. v. Hatt,* No. 97-6961, 1998 WL 159035, at *19 (E.D. Pa. Mar.18, 1998).  *See also Fisher Bioservices, Inc.*, 2006 WL 1517382, at *21 (granting injunctive relief will serve the public interest because it will "discourage . . . the wrongful use of confidential information and

trade secrets" (internal citations and question marks omitted)); *Bimbo Bakeries*, 613 F. 3d at 119

("[T]here is a generalized interest in upholding the inviolability of trade secrets and

enforceability of confidentiality agreements.") (internal quotations omitted).  Thus a preliminary

injunction prevents not only harm to Radian, but also creates a precedent of respect for

employment contracts that will benefit Radian and similarly situated businesses in the course of

other employment relationships.

### III.    CONCLUSION

For the preceding reasons, I will grant Radian's motion for a preliminary injunction

enforcing its restrictive covenant with Bolen.

s/Anita B. Brody

_____

ANITA B. BRODY, J.

Copies **VIA ECF** on _____ to:                    Copies **MAILED** on _____ to: